UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| SHAWN NICHOLAS THEIS, | Case No. 24-CV-2460 (PJS/LIB) |
| Plaintiff, | |
| v. | ORDER |
| DYLAN VAN DER STAD, acting in his individual capacity, and ETHAN NAGEL, acting in his individual capacity, | |
| Defendants. | |

---

Eric A. Rice, LAW OFFICE OF ERIC A. RICE, LLC, and Dane DeKrey, RINGSTROM DEKREY PLLP, for plaintiff.

Joshua Phillip Devaney and Jessica E. Schwie, KENNEDY & GRAVEN, CHARTERED, for defendants.

Plaintiff Shawn Theis, a resident of Polk County, Minnesota, brings this action under 42 U.S.C. § 1983 against defendants Dylan Van Der Stad and Ethan Nagel, both of whom were employed as deputies by the Polk County Sheriff's Office ("PCSO"). Theis alleges that Van Der Stad and Nagel violated his rights under the Fourth and Fourteenth Amendments when they entered his garage after receiving a tip that he had been driving while impaired. Defendants move for judgment on the pleadings, arguing that they are entitled to qualified immunity as a matter of law. The Court disagrees and denies defendants' motion.

I.  BACKGROUND

On June 18, 2023, the PCSO received a tip from a citizen who said that Theis had been at a boat landing earlier in the day and that Theis appeared to have been impaired by alcohol when he got into a truck and drove away.  Compl., ECF No. 1 ¶ 7.  Van Der Stad ran the registration of the truck and learned that the truck's owner lived at Theis's home address.  *Id.* ¶¶ 7–9.

Van Der Stad went to Theis's house, which is on a corner, with the front of the house facing the main street, and with an attached garage facing a side street on the left (as one faces the house).  *Id.* ¶ 10; ECF No. 7-1, Exh's. B, C.  A path that appears to be paved or otherwise finished leads from the main street up to the front door of the house, and a paved driveway runs from the side street to the garage.  ECF No. 7-1, Exh's. B, C.  Van Der Stad parked on the side street and walked up the right side of the driveway toward the garage.  VDS Body Cam., ECF No. 7-1, Exh. D at 0:00–0:14.

The garage has two doors.  The door on the left was closed.  The door on the right was open, and a truck matching the citizen's description was parked in front of it.  *Id.*; Compl. ¶ 11.  Van Der Stad walked around the parked truck and entered the garage, in which an array of Thies's personal possessions were in plain view.  VDS Body Cam. at 0:06–0:35; Compl. ¶ 12.  The lights were off.  VDS Body Cam. at 0:06–0:35.  At no

point did Van Der Stad approach the front door of the house. Compl. ¶ 14. He did not have a warrant. *Id.* ¶ 13.

Somewhat unusually, there are two doors leading from Theis's garage into his home. VDS Body Cam. at 0:21–0:24. One interior door is in the center of the back wall of the garage, facing the garage doors. The other interior door is on the right, near the back of the garage, and partially hidden from view by large shelves that run along the right side of the garage between the right interior door and the front of the garage. *Id.* Also somewhat unusually, both of the doors appear to have doorbells next to them. *Id.*

Van Der Stad rang the doorbell next to the center interior door, and Theis responded by opening the interior door on the right. *Id.* at 0:36; Compl. ¶¶ 14–15. Van Der Stad (who was in uniform) began asking Theis questions about what he had done earlier that day. VDS Body Cam. at 0:40–2:06. Nagel then arrived in the driveway. *Id.* at 3:11; Compl. ¶ 16. A conversation between Theis and (mostly) Nagel took place, with Theis and Van Der Stad standing inside the garage, and Nagel standing in the driveway just outside of the opening. Compl. ¶ 16; VDS Body Cam. at 3:11–21:00.

After a couple of minutes, Nagel asked Theis to do a field sobriety test. VDS Body Cam. at 4:22–4:26. Theis declined. *Id.* at 4:28–4:38. Van Der Stad then described the citizen tip the PCSO had received. *Id.* at 4:49–5:04. Nagel asked again whether Theis would do a field sobriety test, explaining that there was a "reason why [Nagel

was] asking" and that Nagel could "see [that Theis had] bloodshot, watery eyes" and that Theis was slurring his speech. *Id.* at 5:40–5:56. Nagel explained that he was offering Theis the chance to take the field sobriety test so that Theis could "prove that [he was] not impaired." *Id.* at 6:00–6:07.

Theis again said that he did not want to take a field sobriety test. Nagel responded: "Of course nobody wants to go to jail, right? And I'm not saying that you are, I am just trying to give you an opportunity to prove that you don't need to go there." *Id.* at 6:10–7:35. Theis attempted to end the encounter, saying "I just want to be left alone." *Id.* at 6:45–6:48. Nagel told Theis that "if [Theis] didn't want to do the [field sobriety] test," Nagel had to "go off" the citizen complaint and the "clues that [he] c[ould] see," such as the fact that Theis had "bloodshot watery eyes . . . [and] the odor of alcohol coming from [him], . . . [and] a little bit of slurred speech." *Id.* at 7:13–8:21.

Nagel told Theis that if he would not perform a field sobriety test "to prove that [he was] not drunk," then Theis would be placed under arrest for driving while impaired. *Id.* at 8:52–9:37. Theis again refused to perform the test. Compl. ¶ 20. The officers then told Theis that he was under arrest. Before Theis was taken to the sheriff's station, Van Der Stad pulled Theis's truck into the garage at Theis's request, and Theis closed the garage door. ECF No. 7-1, Exh. F at 1:09–7:15.

Theis was charged with driving while impaired. Compl. ¶ 21. During the prosecution of the case, Theis's attorney moved to suppress evidence obtained from Theis's encounter with defendants in his garage. *Id.* ¶ 22. The trial court granted the motion, finding that defendants violated Theis's constitutional rights when they entered the garage without a legal basis and subsequently effected an unlawful arrest. *Id.* ¶ 23. This action followed.

## II. ANALYSIS

### A. Standard of Review

In ruling on a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), a court applies the same standard used in ruling on a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Spagna v. Phi Kappa Psi, Inc.*, 30 F.4th 710, 715 (8th Cir. 2022). Under this standard, the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). "A grant of judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Poehl v. Countrywide Home Loans, Inc.*, 528 F.3d 1093, 1096 (8th Cir. 2008) (internal quotation marks omitted).

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, the motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). But the court may consider materials that are necessarily embraced by the complaint, as well as "some materials that are part of the public record or do not contradict the complaint," without converting the motion into one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003); *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

Defendants submitted materials outside of the complaint with their answer—namely, PCSO records, an aerial image of Theis's house and the surrounding neighborhood, a photograph of Theis's driveway and garage, body-cam videos of the encounter between Theis and defendants, and written transcripts of the body-cam videos. ECF No. 7-1. Theis does not dispute the authenticity or accuracy of the images or videos but objects to the Court's consideration of "any materials beyond uncontested public records," specifically arguing that assertions within Van Der Stad's and Nagel's police reports should not be considered for their truth at this stage. Pl. Mem., ECF No. 18 at 4. The Court has not considered the police reports; instead, the Court has considered only the body-cam videos, the aerial image of Theis's lot, and the photograph of Theis's garage. *See Mattes*, 323 F.3d at 697 n.4; *Porous Media*, 186 F.3d at 1079; *Ching ex rel. Jordan v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023) ("Videos

-6-

of an incident are necessarily embraced by the pleadings."). Thus, the Court need not convert defendants' motion into one for summary judgment.

### B. Unreasonable Search and Seizure

Theis alleges that defendants violated the Fourth and Fourteenth Amendments by unlawfully entering his garage and subsequently arresting him on the basis of information gathered as a result of that unlawful entry. Defendants respond that they are entitled to judgment on the pleadings on the basis of qualified immunity.

To determine whether a law-enforcement officer is entitled to qualified immunity, a court must analyze (1) whether the plaintiff has stated a plausible claim for a violation of a constitutional or statutory right and (2) whether that right was clearly established at the time of the alleged violation. *Dollar Loan Ctr. of S.D., LLC v. Afdahl*, 933 F.3d 1019, 1024 (8th Cir. 2019). "To deny qualified immunity, the answer to both questions must be yes." *Cravener v. Shuster*, 885 F.3d 1135, 1138 (8th Cir. 2018). A court may consider these two questions in either order. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection extends to the curtilage surrounding a home. *United States v. Weston*, 443 F.3d 661, 666 (8th Cir. 2006). Warrantless entry into the home or its

curtilage is presumptively unreasonable, absent consent. *Kentucky v. King*, 563 U.S. 452, 460–63 (2011). At the same time, courts have recognized that, for example, a "knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Florida v. Jardines*, 569 U.S. 1, 8 (2011). This implied license extends to all members of the public, including law-enforcement officers. *Id.* "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any citizen might do." *Id.* at 8 (internal quotation marks omitted). "[P]olice officers [may]—consistent with the Fourth Amendment—approach the front door to announce their presence, make inquiries, and request consent to search the remainder of the property, commonly referred to as a 'knock and talk.'" *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011) (cleaned up).

To overcome a defendant's assertion of qualified immunity, a plaintiff must show that "the violative nature of particular conduct is clearly established." *Ehlers*, 846 F.3d at 1012 (internal quotation marks and original emphasis omitted). Although "prior cases need not have expressly determined that the action in question is unlawful, in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 1008 (internal quotation marks omitted). The plaintiff bears the burden of identifying "either controlling authority or a robust consensus of cases of persuasive authority" that puts

the "constitutional question beyond debate at the time of the alleged violation." *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (cleaned up). Whether the facts alleged in a complaint sufficiently support a claim that an officer's conduct violated clearly established law is a legal question for the Court. *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).

Defendants concede that Theis's garage constitutes curtilage for Fourth Amendment purposes, *see also Luer v. Clinton*, 987 F.3d 1160, 1166 (8th Cir. 2021) (attached garage "obviously included" in home's curtilage), and they do not argue that Theis fails to state a plausible claim. Instead, defendants argue that they are entitled to qualified immunity because the "violative nature" of the conduct alleged by Theis—in particular, Van Der Stad's entering Theis's garage without first attempting to make contact at the front door—was not "clearly established."

Defendants may indeed be entitled to qualified immunity, but the factual record before the Court is sparse, and two issues of fact preclude the Court from holding at this time that defendants are entitled to qualified immunity. The Court analyzes these disputed issues in turn.

### 1. Knock-and-Talk

The first issue concerns defendants' failure to attempt to use the front door to contact Theis before entering his garage. Theis argues that Eighth Circuit precedent

clearly establishes a "knock-and-talk rule"—that is, a rule requiring law-enforcement officers to attempt to contact a homeowner at the front door of his home before attempting to contact him at a secondary entrance.  Theis also notes that neither the complaint nor the record suggests that he generally kept his garage doors open or otherwise invited visitors to approach his home through the garage.  Defendants respond with citations to an array of non-Eighth Circuit case law in support of the proposition that, when a law-enforcement officer approaches a home by a "normal route of access"—or with the reasonable belief that, for example, a back door "is used as a principal entrance to the dwelling"—that officer is not required to first attempt contact at the front door.

As an initial matter, Theis is correct that the Eighth Circuit has held that a law-enforcement officer may not attempt to contact a homeowner at a secondary point of entry without first trying the front door.  In *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011), the Eighth Circuit observed that, "[t]o the extent that the 'knock-and-talk' rule is grounded in the homeowner's implied consent to be contacted at home, [the Eighth Circuit] has never found such consent where officers made no attempt to reach the homeowner at the front door."  *Id.* (declining to extend the knock-and-talk rule where law enforcement did not attempt to contact homeowner at front door before

-10-

entering backyard).[1]  Defendants do not cite, and the Court cannot find, any post-*Wells* cases from the Eighth Circuit revising (let alone abandoning) the requirement that law enforcement first attempt a knock-and-talk at the front entrance before attempting to contact an occupant at a secondary entrance.

---

[1]Defendants make much of the Eighth Circuit's statement in *Wells* that the court was "not prepared to extend the 'knock-and-talk' rule to situations in which the police forgo the knock at the front door and, *without any reason to believe the homeowner will be found there*, proceed directly to the backyard."  *Wells*, 648 F.3d at 680 (emphasis added).  Defendants seem to argue that this fragment of dicta signals the intent of the Eighth Circuit to hold in a future case that, if an officer does have "reason to believe" that a homeowner will be found in a particular location within a home—and bear in mind that curtilage (such as Wells's backyard or Theis's attached garage) generally "should be treated as the home itself," *United States v. Dunn*, 480 U.S. 294, 300 (1987)—the officer can "proceed directly" to that location within the home without first knocking at the front door.

That is obviously not the law, and no reasonable officer could believe that it is the law.  No court—before *Wells*, in *Wells*, or since *Wells*—has held that if, say, an officer has reason to believe that a homeowner is in her basement, the knock-and-talk rule permits the officer to proceed directly to the basement without first knocking at the front door.  Of course, it is always possible that a court will modify existing case law in the future, but that does not mean that existing case law is not clearly established.

Moreover, even if *Wells* left the scope of the knock-and-talk rule in doubt, the Court could not grant defendants' motion because the current record provides no reason to believe that Van Der Stad proceeded directly to the center interior door in the garage because he had "reason to believe" that Theis was near that door.  For all we know from the current record, Theis could have been sitting next to his front door at the time that Van Der Stad entered his garage.  We do know that, after Van Der Stad rang the doorbell next to the center interior door, Theis respond not by opening that door, but by opening the right interior door.

Nonetheless, the Court will assume, for the sake of argument, that case law does not clearly establish that a law-enforcement officer must *always* attempt a knock-and-talk at a home's front door before trying a secondary entrance.  *See Carroll v. Carman*, 574 U.S. 13, 20 (2014) (per curiam); *State v. Chute*, 908 N.W.2d 578, 587 (Minn. 2018) ("The federal circuits have split as to whether an implied license requires an officer to first approach the front door when attempting a 'knock-and-talk.'" (discussing *Wells*)).  As defendants concede, however, case law *does* clearly establish that "utilizing an area not generally made accessible to visitors before attempting the front door is not a valid exercise of the 'knock-and-talk' [rule]."  *See* Def. Mem., ECF No. 13 at 5–6 (citing *Wells*, 648 F.3d at 680).[2]  Thus, whether defendants violated clearly established law depends on whether a reasonable officer in their position could have concluded that the doors inside of Theis's garage were "generally made accessible to visitors."

Defendants argue that the interior doors were indeed "generally made accessible to visitors."  Def. Mem. at 7.  But the complaint does not allege that visitors regularly

---

[2]*See also United States v. Schuck*, 713 F.3d 563, 567 (10th Cir. 2013) (holding that law enforcement may prefer a "normal route of access" to a home over the home's front door when attempting a knock-and-talk); *United States v. Garcia*, 997 F.2d 1273, 1279–80 (9th Cir. 1993) (holding that law enforcement does not violate the Fourth Amendment where "the front and back of a residence are *readily accessible* from a public place, like the driveway" and "officers go to the back door *reasonably believing* it is used as a *principal entrance* to the dwelling." (emphasis added))); *see also Carroll*, 574 U.S. at 18–20 (law enforcement's reasonableness in approaching non-primary entrance turns on whether secondary entrance is "open to visitors").

used the interior garage doors, let alone that those doors were a "principal [public] entrance" to the home. And nothing in the body-cam videos (except for the presence of a doorbell next to the center interior door), aerial image, or photograph of the garage supports defendants' assertion. *See generally* Compl.; Pl. Mem. at 7; ECF No. 7-1, Exh's. B, C.

Defendants argue that, even if Van Der Stad was not correct in his assessment that there was an implied license to the public to approach the house through the garage, a reasonable officer in his position could have so concluded. Def. Mem. at 5–7; *cf. Sanders v. Newton*, 117 F.4th 1059, 1067 (8th Cir. 2024) *abrogated on other grounds by S.A.A. v. Geisler*, 127 F.4th 1133 (8th Cir. 2025) ("Qualified immunity protects reasonable mistakes of fact." (internal quotation marks omitted)). Putting aside the fact that the complaint does not allege—and the record does not establish—that Van Der Stad *in fact* believed that he had an implied license to enter the garage, the Court cannot hold as a matter of law that a reasonable officer in Van Der Stad's position could have formed such a belief.

The body-cam video shows Van Der Stad approaching Theis's home from the right side of the driveway. The garage door on the left was closed. The garage door on the right was open, but it was mostly blocked by Theis's large truck, which was parked

just outside the opening.  Van Der Stad walked along the right (passenger) side of the truck as he approached the garage.

As the body-cam video makes clear, Van Der Stad could not see the right interior door as he entered the garage, as his view was blocked by the shelves.  Van Der Stad may have seen the center interior door.  But the garage was dark, and it was full of Theis's personal possessions—possessions that he would not want to be stolen and probably would not want to be displayed to the general public.  In sum, to approach the center interior door, Van Der Stad had to walk around Theis's truck, enter the opening, walk through the dark garage, and walk past Theis's personal possessions.  Without more, the Court cannot conclude that a reasonable officer in Van Der Stad's position could have concluded that the interior of Theis's garage was "open to visitors" or that the center interior door was a "normal" or "principal [public] entrance."

In arguing to the contrary, defendants mainly rely on the fact that there was a doorbell next to the center interior door—a doorbell that (they say) could be spotted from the driveway if a garage door was open. Def. Mem. at 5.  Defendants analogize that doorbell to the knocker on a front door mentioned by the Supreme Court in *Florida v. Jardines*, 569 U.S. 1, 8 (2011).  Defendants contend that Theis's doorbell, akin to the front-door knocker mentioned in *Jardines*, implied a license to the public to enter the garage and approach the interior door.  *Id.*

It is not clear, however, whether Van Der Stad saw the doorbell from the driveway, given the size of the garage; the fact that none of the lights in the garage were on; and the size, color, and placement of the doorbell.[3]  Moreover, the complaint does not allege that Van Der Stad entered the garage *because* he noticed a doorbell next to the interior door; rather, the complaint alleges that Van Der Stad saw that one of the garage doors was open and, *after* he entered the garage, he walked to the back and rang a doorbell next to an interior door.  Compl. ¶¶ 12, 14.

Given the state of the record, the Court cannot hold, as a matter of law, that the fact that Van Der Stad may have been able to spot a doorbell next to an interior door at the back of the garage—a garage that was attached, half-closed, blocked by a truck, and full of personal belongings—means that a reasonable officer in Van Der Stad's position could have concluded that the interior door was a "normal" or "principal [public] entrance" to the home.

---

[3]As an aside, the Court notes that, whatever the explanation for the doorbells on the interior garage doors, the fact that at least one doorbell was difficult to see from outside the garage undermines defendants' argument that the doorbells functioned as implicit licenses to the general public to enter the garage.

2. Defendants' Intent

Even if the Court is incorrect and a reasonable officer in Van Der Stad's position could have believed that there was an implied license for the public to walk through Theis's garage and approach the center interior door, defendants would still not be entitled to qualified immunity at this stage of the litigation.

As discussed above, the knock-and-talk rule permits law enforcement to enter property pursuant to an implied license, provided that law enforcement has a legitimate law-enforcement objective *other than conducting a search*.  "The scope of a license—express or implied—is limited not only to a particular *area* but also to a specific *purpose*."  *Jardines*, 569 U.S. at 9 (emphasis added).  In other words, whether law enforcement has an implied license to enter a home's curtilage "depends on the purpose for which they enter."  *See id.* at 10.  "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do."  *Id.* at 8 (internal quotation marks omitted).  But when a police officer's "behavior objectively reveals a purpose to conduct a search," the officer exceeds the scope of this implied license and runs afoul of the Fourth Amendment.  *Id.* at 8–10.

The complaint says nothing about Van Der Stad's purpose in entering the garage, and the body-cam recordings actually lend support to Theis's claim.  Specifically, the recordings show that, just a few minutes into defendants' encounter with Theis, Nagel

-16-

asked Theis to take a field sobriety test "to prove that [he was] not impaired." When Theis refused, Nagel responded by summarizing the evidence of intoxication that Van Der Stad and he had gathered *from their observations of Theis in the garage*, saying that the officers could see Theis's "bloodshot, watery eyes," hear him "slur[ring] [his] speech," and "smell the odor of alcohol coming from" him. Nagel added that, if Theis did not take a field sobriety test, the officers would "have to make a decision based off the clues that [they] c[ould] see." Theis attempted to end the encounter, but the officers refused to leave. Nagel repeated what he perceived as signs of Theis's intoxication, and told Theis that, if Theis would not perform a field sobriety test, Theis would be placed under arrest.

Construing any ambiguities in the video recording in Theis's favor, *see Thompson v. City of Monticello*, 894 F.3d 993, 999 (8th Cir. 2018), the Court finds that Theis plausibly alleges that defendants' purpose in approaching his home was to search him—that is, to inspect his person and demeanor for evidence of his intoxication. *See United States v. Jones*, 565 U.S. 400, 406 n.3 (2012) ("Where . . . the Government obtains information by physically intruding on a constitutionally protected area, [a] search [for purposes of the Fourth Amendment] has undoubtedly occurred."). The Court therefore cannot hold, as a matter of law, that defendants are entitled to qualified immunity.

To be clear: The Court is denying defendants' motion without prejudice because of factual disputes that cannot be resolved based on the record as it currently exists. Nothing precludes defendants from again raising the defense of qualified immunity after the parties have further developed the record.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendants' motion for judgment on the pleadings [ECF No. 9] is DENIED WITHOUT PREJUDICE.

Dated: August 20, 2025

/s/ Patrick J. Schiltz
Patrick J. Schiltz, Chief Judge
United States District Court